**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MELISSA M. MCALLISTER,

            *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL SECURITY,

            *Defendant.*

_____/

CIVIL ACTION NO. 15-13605

DISTRICT JUDGE TERRENCE G. BERG

MAGISTRATE JUDGE PATRICIA T. MORRIS

**<u>MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS
MOTIONS FOR SUMMARY JUDGMENT (Docs. 14, 16)</u>**

**I.**     <u>**RECOMMENDATION**</u>

      In light of the entire record in this case, I suggest that substantial evidence supports

the Commissioner's determination that McAllister is not disabled. Accordingly, **IT IS**

**RECOMMENDED** that McAllister's Motion for Remand (Doc. 14) be **DENIED**, the

Commissioner's Motion (Doc. 15) be **GRANTED**, and that this case be **AFFIRMED**.

**II.**     <u>**REPORT**</u>

      **A. Introduction and Procedural History**

      Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of

Reference, this case was referred to the undersigned magistrate judge for the purpose of

reviewing a final decision by the Commissioner of Social Security ("Commissioner")

denying Plaintiff's claim for a period of disability and Disability Insurance Benefits

("DIB") under Title II of the Social Security Act 42 U.S.C. § 401 *et seq.* and Supplemental

Security Income ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq.* (Doc. 3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 14, 15).

On February 24, 2009, Plaintiff Melissa McAllister filed an application for DIB and SSI, alleging a disability onset date of October 16, 2008. (Tr. 88). The claims proceeded to a hearing before ALJ Joseph P. Donovan, Sr. on February 18, 2011. (*Id.*). On March 21, 2011, ALJ Donovan, Sr. denied McAllister's claim. (Tr. 88-96). The Appeals Council denied review of the ALJ's decision. (Tr. 101-06).

McAllister filed the present application for DIB on July 31, 2012 and for SSI on July 20, 2012.  (Tr. 233-35). The Commissioner denied both claims. (Tr. 143-52). McAllister then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on April 3, 2014, before ALJ Dawn Gruenburg. (*Id.* at 53-84). At the hearing, McAllister—represented by her attorney, John Morosi—testified, alongside Vocational Expert ("VE") Paul Delmar. (*Id.*). The ALJ's written decision, issued April 16, 2014, found McAllister not disabled. (*Id.* at 33-52). On August 20, 2015, the Appeals Council denied review, (*Id.* at 1-7), and McAllister filed for judicial review of that final decision on May 27, 2014. (Doc. 1).

### B.  Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks

omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:   If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and

considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ found McAllister not disabled under the Act. (Tr. 33-52). At Step One, the ALJ found that McAllister had engaged in substantial gainful activity following the alleged onset date of October 1, 2011. (Tr. 38). At Step Two, the ALJ concluded that the following impairments qualified as severe: "degenerative joint disease of the bilateral hips; adhesive capitulitis of the bilateral shoulders; degenerative disc disease of the lumbar spine; neuropathy; scoliosis; headaches; fibromyalgia; obesity, idiopathic hypersomnia; adjustment disorder with mixed anxiety and depressed mood; and pain disorder." (*Id.*). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 39). Following this, the ALJ found that McAllister had the residual functional capacity ("RFC") to perform light work with the following additional limitations:

5

[T]he claimant can occasionally push or pull with the upper and lower extremities, the claimant can frequently climb up to 2 flights of stairs, but cannot climb ladders. The claimant can frequently balance and stoop, and occasionally kneel and crawl. The claimant can occasionally reach overhead with the upper extremities, and frequently feel, finger, and handle objects. The claimant must avoid concentrated exposure to chemical fumes, dust, mold, and extreme hot and cold temperatures. The claimant must avoid all exposure to hazards and vibrations (both flooring and machinery) at the worksite. The claimant is limited to performing simple tasks and working in a small familiar group. The claimant requires the ability to alternate between sitting and standing at will.

(Tr. 40-41). At Step Four, the ALJ found McAllister "unable to perform any past relevant work." (Tr. 45). Proceeding to Step Five, the ALJ determined that there exist jobs in significant numbers in the national economy that the claimant can perform, and thus found McAllister not disabled. (Tr. 46-47).

### E. Administrative Record

#### 1. Medical Evidence

A pre-hearing memorandum filed by McAllister's attorney, Mr. Morosi, listed her impairments as "Generalized Anxiety Disorder, Depressive Disorder [not otherwise specified], Bilateral Shoulder Pain with Adhesive Capsulitis, Myofascial Pain Syndrome, Diabetes Mellitus, Type II, Ataxia, Headaches, Bilateral Hip Pain, Hypertension, Hypothyroidism, Diabetic Neuropathy, Thoracic Scoliosis, Fibromyalgia, Tachycardia, Urinary Frequency, Idiopathic Hypersomnia, L3-Lf, L4-L5 Neural Foraminal Stenosis (Bilateral), Adjustment Disorder, Pain Disorder, [and] B-Complex Deficiencies." (Tr. 330). To alleviate the items on McAllister's taxing list of impairments, she requires an equally taxing helping of medication, including: Actos (for diabetes); an albuterol inhaler

(for asthma); Baby Aspirin (for heart health and inflammation); Baclofen (for ataxia and tremors); Cymbalta (for neuropathy and fibromyalgia); Januvia (for diabetes); Lidoderm patches (for pain); Lisinopril HCTZ (for high blood pressure); a multivitamin (for vitamin deficiencies); Naproxen (for pain); Nasonex (for allergies); Protonix (for stomach pain); Singular (for allergies and asthma); Synthroid (for hypothyroid); Ultram ER (for pain); Vicodin (for pain); Vytorin (for high cholesterol); and Welchol (for high cholesterol) (Tr. 265).

In a series of evaluations from Mid-Michigan Neurology Center between September of 2009 and December of 2011, McAllister's pain gradually exacerbated, with an upwards trajectory moving from one to three on a scale of six—though fluctuations from this pattern appear in the record. (Tr. 388-404). A letter from Dr. Kristie Truman to Mary Stuner, N.P. dated August 19, 2009, noted a number of the alleged impairments which appear in Mr. Morosi's memorandum, including: McAllister's "bowel urgency," "daytime fatigue" and "idiopathic hypersomnolence," "hyperthyroidism," "hypertension," "hyperlipidemia," "diabetes mellitus type 2," and "tobacco abuse." (Tr. 405). She also described "adventitious movement such as tremors or fasciculations" on motor examination. (*Id.*). Her symptoms of "body tremors and muscle weakness" had "no specific pattern." (Tr. 406).

In July of 2011, McAllister's "[d]iffuse" pain, (*Id.*), continued to persist, as a report from Dr. Devota Nowland—one of McAllister's treating physicians—confirms. (Tr. 460) (detecting tender points in a musculoskeletal assessment; diagnosing fibromyalgia, scoliosis, and diabetic neuropathy). Earlier that year, in February of 2011, Dr. Nowland recorded "[e]ssentially a negative Holter [test] except for occasion premature atrial

contractions noted." (Tr. 482). An EMG report dated January of 2011 from Dr. Zubair Shaikh—McAllister's other treating physician—found "tender points consistent with myofascial pain syndrome" but no "convincing evidence for significant peripheral neuropathy, lumbosacral radiculopathy, or myopathy." (Tr. 474). Although an MRI of the lumbar spine without contrast at Mid Michigan Medical Center in October of 2011 found "minor variable disc desiccation, loss of disc height, and endplate spondylosis between T11-12 and L5-S1," (Tr. 685), it also found "[n]o disc protrusion." (Tr. 476). A later evaluation by Dr. James Ware, from October of 2012, noted that McAllister complained of allergies, tachycardia, dizziness, tinnitus, diabetes and thyroid disease, easy bruising, urinary difficulties, back, shoulder, and arm pain, ataxia and numbness, depression and anxiety, and asthma. (Tr. 490). Dr. Ware's analysis also found "5/5 strength" with regard to normal flexion, abduction, internal rotation, and external rotation in the right upper extremity. (Tr. 491). He also detected tenderness in the left upper extremity.

The severity accompanying McAllister's pain seems to wax and wane at times. In October of 2012, Dr. Ware reported "intermittent" pain in shoulders deriving from "no known trauma," but stated that physical therapy, by McAllister's admission, helped with the pain. (Tr. 490). Medication also had mixed results. A report from Mid-Michigan Neurology Center from the same month notes that Neurontin had improved McAllister's tremor and insomnia but aggravated her fatigue. (Tr. 497). A physical examination detected "pain on cervical palpation, pain on thoracic palpation, pain on lumbar palpation and decreased ROM of spine." (*Id.*). And both the results from physical exams and McAllister's complaints seem to remain consistent throughout this period. (Tr. 503-04). Indeed, the

8

Consultative Exam Report from George Ronan, Ph.D., dated February of 2013, rates her pain as a five out of ten, and allegations from McAllister of "peripheral neuropathy, fibromyalgia, and degenerative disk disease." (Tr. 507).

McAllister's social impairments seem secondary to, but impacted by, her physical ones. As Ronan, Ph.D. reports in his Consultative Exam Report, McAllister reported "having a couple of close friends and one that she interacts with on a regular basis." (Tr. 508). Her daily activities included waking at noon, watching television or playing the computer, sleeping about three more hours in the afternoon and eating again at 10:00 PM, then playing games or watching television until bed at 3:00 AM. Her idiopathic hypersomnia "causes [her] to sleep more" and she "never feels rested upon awakening." (*Id.*) (internal quotation marks omitted). "My cousin does 90% of the household chores because I physically can't do them." (*Id.*). In his analysis, Ronan, Ph.D. writes that "[h]er emotional reaction is best described as mildly depressed." (Tr. 509). He then diagnosed her with "[a]djustment disorder with mixed anxiety and depressed mood," "[p]ain disorder with both psychological factors and a general medical condition," "[a]llergies, asthma, ataxia, B3 deficiencies, degenerative disk disease, diabetes, essential tremors, fibromyalgia, high blood pressure, high cholesterol, hypothyroidism, idiopathic hypersomnia, micro value regurgitation, migraine headache, [and] scoliosis" with a GAF score of 60. (Tr. 510).

Much of the evidence on record relating to McAllister's physical impairments appeared in Dr. Nowland's reports since September of 2012. An x-ray of her hips revealed "[m]inor arthritic changes in the left acetabulum" and "[m]inor arthritic changes . . . in the

right hip joint." (Tr. 528-29). She exhibited "decreased sensation to touch in both feet and ankles" in June of 2013, and "tender points for fibromyalgia." (Tr. 538). The period after September of 2013 with Dr. Nowland reflected similar complaints and symptoms. In her RFC assessment, dated March 17, 2014, Dr. Nowland indicated that McAllister could lift up to twenty pounds occasionally, could occasionally bend and twist at the waste, and received medical treatment more than three times a month. (Tr. 655). McAllister, the report indicated, would have to lie down "at unpredictable intervals during a work shift" and "need[s] a job which permits shifting positions *at will* from sitting, standing or walking." (Tr. 654). She described McAllister's symptoms as "chronic fatigue, muscle pain, [and] decreased sensation of feet"—subjective symptoms confirmed by objective evidence of "[s]ensory loss" and "[m]uscle spasm." (Tr. 652-53). The report indicated that, as a result of these impairments, McAllister can only sit continuously for thirty minutes, and stand continuously for fifteen minutes. (Tr. 654).

Dr. Shaikh's reports since July of 2013 also shed light on these impairments, with a September 2013 evaluation revealing symptoms such as fatigue, back pain, headaches, anxiety and depression, and easy bruising. (Tr. 545). An accompanying physical exam found multiple tenderpoints in the lumbosacral spine, and pain of lumbosacral "palpation." An exam in November of 2013 uncovered substantially similar results. (Tr. 550-54). Diagnoses of neck and lower back pain followed. (*Id.*). In a later letter, Dr. Shaikh reaffirmed that McAllister "has been diagnosed with tremor, fibromyalgia, migraine headaches, hypertension, neck pain, lower back pain, B12 deficiency, fatigue, and Type II D[iabetes]M[ellitus]." (Tr. 657). He warned that fibromyalgia symptoms "are variable and

10

often exacerbated by extremes in temperature/environment," while also recognizing that "her migraine headaches are currently stable . . . [occurring] twice a week with varying severity." He then recommended that she "avoid repetitive bending and twisting motions." (*Id.*).

### 2. Application Reports and Administrative Hearing

#### a. Function Report

McAllister completed a function report on September 23, 2012. In it, she lists back pain from sitting and standing, hip pain, limited mobility with her arms, an inability to stand for long due to numbness and weakness in her hip and feet, as well as pain and clamping in her hands as conditions limiting her ability to work. (Tr. 276). In addition, she check-marked the following difficulties: lifting, squatting, standing, reaching, walking, sitting, kneeling, talking, stair climbing, memory, completing tasks, concentration, following instructions, and using hands. (Tr. 281). She can "only lift like 5 lbs and not for very long," will "lose balance trying to squat," can only stand for "5-15 min[utes]" and sit upright for "15-30 min[utes]. . . ." (*Id.*). The amount of time she can pay attention "depends from matter of minutes to hours," and sometimes she must "read [instructions] several times to comprehend." (*Id.*) These conditions not only affect work, but also her capacity to "properly care for myself, go for walks, enjoy life, work." (Tr. 277).

These impairments, she writes, interfere with her ability to dress herself and "do small buttons, shoulders make it difficult." (*Id.*). She cleans and showers about once weekly, and attends physical therapy ("PT") "[o]nce or twice a week," and she sometimes does these exercises at home. (*Id.*). Showering, however, can present difficulty, as she finds

it "hard to reach hair sometimes" and uses a chair because she cannot stand for long. (*Id.*). She can prepare food daily in the microwave so long as it "can be eaten as it came." (Tr. 278). But her tremors interfere with eating. (Tr. 277). And she can endure laundry, light cleaning, and dishes, although doing so takes "hours" and she needs to "stop often." (Tr. 278). For travel, she can drive and ride in a car, though not "for long periods of time . . . because it can be painful, [and] sometimes my coordination is off." (Tr. 279). Once or twice a month, she spends thirty minutes shopping for groceries and personal care items. (*Id.*). She can also pay bills, count change, handle a savings account, and use a checkbook or money orders. (*Id.*).

McAllister relays a partially active, somewhat troubled, social life. She lives in a manufactured home with her cousin. (Tr. 276). Her daily activities include lying on the couch, watching television, and playing computer games. (Tr. 277). "Since they are sedentary and I can do them lying down, I do them daily and no problems except occasionally falling asleep." (Tr. 280). She "will talk to family [and] close friends on the phone, computer, or in person" daily. (*Id.*). She does not, however, go anywhere regularly except the doctor's office, (*Id.*); she stopped going "to church [and] activities due to physical limitations [and] not wanting to be around people." (Tr. 281). Despite a proclaimed "fear of people," she gets along with authority figures "fine" and has not been fired for problems with people in the past. (Tr. 282).

McAllister's cousin, Briten Bailey, also submitted a function report on September 24, 2012. He describes McAllister as in "constant pain," unable to stand or walk. (Tr. 288). Before these impairments, he says she used to "[d]ance, [t]ravel, work, walk, swim,

anything I would do." (Tr. 289). He confirms that "[d]riving about 5 miles to Dr. [and] store is the extent of her driving." (Tr. 291). In all relevant respects, Mr. Bailey's report is substantially consistent with McAllister's.

### b. McAllister's Testimony at the Administrative Hearing

At her hearing, McAllister began her testimony with a review of her sleep impairments. She found maintaining "any kind" of sleep pattern "impossible" due to her sleeping disorder, and she was "just generally fatigued all day." (Tr. 58). She further indicated that "I sleep a lot. I sleep usually about 12 hours a night, and then about a three hour nap in the afternoon . . . I never feel refreshed with the idiopathic hypersomnia; I just always feel tired." (Tr. 67). She refuses to drive long distances because of her tendency to nod off. (Tr. 68). In addition, her hypoglycemia, hypothyroidism, idiopathic hypersomnia, and fibromyalgia have all "intensified my fatigue." (Tr. 69). And the arthritis in her hips "can interrupt my sleeping also." (Tr. 73).

She also testified to chronic back, hip, leg, and foot pain. Walking inflicted "the same pain in my feet, my legs, and my lower back, but then also my hips." (Tr. 58-59). She spent most time—"at least 75% of my day," (Tr. 64)—"with my feet elevated or laying down because of those issues." (Tr. 59). An October, 2011 MRI indicated that she had "degenerative disc disease, and that my vertebrae had shifted and was in my nerve bed." (Tr. 66). This pain exacerbated her concentration difficulties due to "always having to . . . reposition." (Tr. 68).

At several points, she seemed to indicate that treatment helped her manage certain impairments. As to her shoulder difficulties, she testified that "[i]t's pretty well back to

13

normal. So most things I don't have a problem with anymore," though she must maintain exercises to keep the impairment at bay. (Tr. 69). She mentioned issues with urinary frequency and admitted that accidents happen "every couple of months." (Tr. 70). By contrast, her diabetes "runs in the normal range" so long as she takes her Januvia and Metformin pills. (Tr. 69). Though she suffered from depression and social anxiety, "being medicated more" helped alleviate her symptoms. (Tr. 59). An uptick in her Cymbalta dosage (which was originally diagnosed for neuropathy) began helping with her depression and anxiety as well. (*Id.*). And she indicated that medication also "helps with headaches, and I'm down to probably about one or two [headaches] a week," lasting from "a minimal like three hours to a maximum of a day or two." (Tr. 71).

When asked about her medication, she recited the following laundry list: "Baclofen, Cymbalta, Neurontin, Synthroid, Lisinopril, Hydrochlorazine," "Januvia, Metformin, Vytorin, Ultram ER, Meloxicam, Protonix, Loratadine, Welchol," "a vitamin B12 shot," "vitamin D2 prescription, a multi-vitamin, a baby Aspirin, Narco," "an Albuterol inhaler, Nasonex, and Lidoderm patches," all of which were prescribed by Dr. Shaikh or Dr. Nowland, her two primary treating physicians at the time of the hearing. (Tr. 62).

### c. The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of a VE to determine McAllister's ability to perform work. (Tr. 77). Commencing Step Four of her analysis, the ALJ asked the VE to assume a hypothetical individual "of this claimant's age, education, and past work experience, capable of a light exertion limitation" who can "occasionally use hand, arm, foot, and leg controls, reach, kneel, crouch, crawl, . . . frequently feel, finger, and handle

14

with the upper extremities, . . . frequently balance and stoop," but who "is limited to climbing up to two flights of stairs at a . . . worksite[] [and] never ladders." (*Id.*). This individual "[m]ust avoid concentrated exposure to chemical fumes, extreme temperatures, dust, dander, and mold, and must avoid all unprotected heights, hazardous machinery, and vibrations whether in flooring or in machinery." (*Id.*).

The VE determined that the hypothetical individual could perform past work as a "clerk at the bookstore per the DOT, the manager of the bookstore per the DOT, and the home improvement manager both the DOT and as performed. And then the team leader or the gift shop manager per the DOT." (Tr. 78). This individual, however, would not be able to perform the gift shop manager or bookstore manager jobs if required to lift fifty pounds. (*Id.*). Other jobs available to this hypothetical individual included "routing clerk" with 4,500 Michigan jobs and 180,000 national jobs, as well as "general clerk" with 10,000 Michigan jobs and 500,000 national jobs. (*Id.*)

The ALJ then altered the hypothetical, asking whether jobs existed for an individual: "capable of a light exertional limitation with a sit and stand option at will, with the same limitations as far as occasionally push pull with the upper and lower extremities, can frequently climb stairs, never ladders, can frequently balance and stoop, can occasionally kneel and craw[l], can occasionally reach overhead with the upper extremities, can frequently feel, finger, and handle objects, must avoid concentrated exposure to extreme hot and cold and fumes, must avoid all hazards at the worksite, and vibration at the worksite. This individual would be capable of simple tasks on a sustained basis, and will best work in a small, familiar group. Can this hypothetical individual do the same work as

. . . the same jobs . . . available as in the first hypothetical[?]" (Tr. 79). The VE indicated
"no past work" would be available, although: routing clerk jobs would exist in reduced
numbers (1,500 in Michigan, 60,000 nationally); office clerk jobs would exist in reduced
numbers as well (2,500 in Michigan, 100,000 nationally); and general clerks would exist
in the same number as office clerk jobs, both in Michigan and nationally. (Tr. 79). And
although "the DOT doesn't address sit stand" the VE characterized his estimates as "based
on my contact with employers throughout the state of Michigan as a rehabilitation
counselor." (Tr. 80).

The ALJ again modified the hypothetical with respect to a "sedentary exertional
limitation." (Tr. 79). The VE indicated, again, that "[n]o past work" would be available,
but that "final assembly" (1,500 in Michigan, 60,000 nationally), "inspector" (1,800 in
Michigan, 80,000 nationally), and "sorter" (1,800 in Michigan, 60,000 nationally) would
incorporate a "sedentary sit stand, unskilled" requirement. (Tr. 79-80).

In one final hypothetical alteration, the ALJ asked whether this individual,
"regardless of the exertional limitation[,] would need additional breaks throughout the
work day for health maintenance whether pain, fatigue, or mental health issues, these
breaks would be unscheduled and would equal at least one additional hour of break time
per day." (Tr. 80). The VE indicated that such a requirement "would not be compatible
with competitive employment, and that's based on my meeting with employers and
reviewing employment requirements throughout the state of Michigan." (Tr. 81).  He gave
the same answer when asked whether the individual could be "off task 15 percent or more
of the work day." (*Id.*). He again gave the same answer when asked the whether the

16

individual could obtain employment if she "needed the opportunity to recline or lift the lower extremities at least waist high throughout the day." (Tr. 81-82). And he gave the same answer if the individual's persistent tardiness resulted in delays of half-an-hour or more. (Tr. 82).

### F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B).     The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).   Both   "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

17

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

18

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186,

at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

   (i)    [D]aily activities;
   (ii)   The location, duration, frequency, and intensity of . . . pain;
   (iii)  Precipitating and aggravating factors;
   (iv)  The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
   (v)   Treatment, other than medication, . . . received for relief of . . . pain;
   (vi)  Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

In the Sixth Circuit, a prior decision by the Commissioner can preclude relitigation in subsequent cases.

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

SSAR 98-4(6), 1998 WL 283902, at *3 (acquiescing to *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997)). The regulations also explicitly invoke *res judicata*: An ALJ can dismiss a hearing where "res judicata applied in that we have a previous [final] determination or decision under this subpart about your rights." 20 C.F.R. §§ 404.957, 416.1457. Collateral estoppel is the branch of *res judicata* applied in this context. As the Third Circuit explained, *res judicata* formally "consists of two preclusion concepts: issue preclusion and claim preclusion." *Purter v. Heckler*, 771 F.2d 682, 689 n.5 (3d Cir. 1985); *see also Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998) (discussing the "collateral estoppel branch of res judicata" in social security cases). Claim preclusion prevents renewing a judgment on the same cause of action; issue preclusion, or collateral estoppel is less expansive: "foreclosing relitigation on all matters that were actually and necessarily determined in a prior suit." *Purter*, 771 F.2d at 689 n.5.

The *res judicata* effect of past ALJ decisions is actually a form of collateral estoppel precluding reconsideration of discrete factual findings and issues. *See Brewster v. Barnhart*, 145 F. App'x 542, 546 (6th Cir. 2005) ("This Court will apply collateral estoppel to preclude reconsideration by a subsequent ALJ of factual findings that have already been decided by a prior ALJ when there are no changed circumstances requiring review."). The Commissioner's internal guide explains the different issues and factual findings precluded by *res judicata* under *Drummond*. *See Soc. Sec. Admin., Hearings, Appeals, and Litigation Law Manual*, § I-5-4-62, 1999 WL 33615029, at *8-9 (Dec. 30, 1999). These include the RFC and various other findings along the sequential evaluation process, such as "whether

a claimant's work activity constitutes substantial gainful activity," whether she has a severe impairment or combination of impairments, or whether she meets or equals a listing. *Id.*

Evidence of "changed circumstances" after the prior decision allows the ALJ to make new findings concerning the unadjudicated period without disturbing the earlier decision. *See Bailey ex rel. Bailey v. Astrue*, No, 10-262, 2011 WL 4478943, at *3 (E.D. Ky. Sept. 26, 2011) (citing *Drummond*, 126 F.3d at 842-43). In other words, even though the first ALJ did not make any findings concerning later periods, her decision still applies to those periods absent the requisite proof. Thus, as applied in this Circuit, the SSAR 98-4(6) and *Drummond* essentially create a presumption that the facts found in a prior ruling remain true in a subsequent unadjudicated period unless "there is new and material evidence" on the finding. *See Makinson v. Colvin*, No. 5: 12CV2643, 2013 WL 4012773, at *5 (N.D. Ohio Aug. 6, 2013) (adopting Report & Recommendation) ("[U]nder *Drummond* and AR 98-4(6), a change in the period of disability alleged does not preclude the application of *res judicata*." (citing *Slick v. Comm'r of Soc. Sec.*, No. 07-13521, 2009 U.S. Dist. LEXIS 3653, 2009 WL 136890, at *4 (E.D. Mich. Jan. 16, 2009))); *cf. Randolph v. Astrue*, 291 F. App'x 979, 981 (11th Cir. 2008) (characterizing the Sixth Circuit's rule as creating a presumption); *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988) ("The claimant, in order to overcome the presumption of continuing nondisability arising from the first administrative law judge's findings of nondisability, must prove 'changed circumstances' indicating a greater disability." (quoting *Taylor v. Heckler*, 765 F.2d 872, 875 (9th Cir. 1985))).

In *Drummond*, for example, the court held that the first ALJ's RFC applied to a subsequent period unless the circumstances had changed. 126 F.3d at 843; *see also Priest v. Soc. Sec. Admin.*, 3 F. App'x 275, 276 (6th Cir. 2001) (noting that in order to win benefits for a period after a previous denial, the claimant "must demonstrate that her condition has so worsened in comparison to her condition [as of the previous denial] that she was unable to perform substantial gainful activity"); *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1232-33 (6th Cir. 1993) (same). The Sixth Circuit made this clear in *Haun v. Commissioner of Social Security*, rejecting the argument that *Drummond* allowed a second ALJ to examine *de novo* the unadjudicated period following the first denial. 107 F. App'x 462, 464 (6th Cir. 2004).

To overcome the presumption that the claimant remains able to work in a subsequent period, the claimant must proffer new and material evidence that her health declined. The Sixth Circuit has consistently anchored the analysis on the comparison between "circumstances existing at the time of the prior decision and circumstances existing at the time of the review . . . ." *Kennedy v. Astrue*, 247 F. App'x 761, 768 (6th Cir. 2007). In a case predating *Drummond*, the court explained. "[W]hen a plaintiff previously has been adjudicated not disabled, she must show that her condition so worsened in comparison to her earlier condition that she was unable to perform substantial gainful activity." *Casey*, 987 F.2d at 1232-33. Later, it reiterated, "In order to be awarded benefits for her condition since [the previous denial], Priest must demonstrate that her condition has . . . worsened in comparison to her [previous] condition . . . ." *Priest*, 3 F. App'x at 276. The ALJ must scan the medical evidence "with an eye toward finding some change from the previous ALJ

24

decision . . . ." *Blackburn v. Comm'r of Soc. Sec.*, No. 4:1-cv-58, 2012 WL 6764068, at \*5 (E.D. Tenn. Nov. 14, 2012), *Report & Recommendation adopted by* 2013 WL 53980, at \*1 (Jan. 2, 2013). That is, the evidence must not only be new and material, but also must show deterioration. *Drogowski v. Comm'r of Soc. Sec.*, No. 10-12080, 2011 U.S. Dist. LEXIS 115925, 2011 WL 4502988, at \*8 (E.D. Mich. July 12, 2011), *Report & Recommendation adopted by* 2011 U.S. Dist. LEXIS 110609, 2011 WL 4502955, at \*4 (Sept. 28, 2011). In *Drogowski*, for example, the court rejected the plaintiff's argument that a report met this test simply because it was not before the first ALJ. *See* 2011 WL 4502988 at \*2, 8-9. These decisions make clear that the relevant change in circumstances is not a change in the availability of evidence but a change in Plaintiff's condition.

    *Res judicata* is not a complete bar on reconsidering prior decisions or determinations: the regulations provide two mechanisms for such reexamination that escape the doctrine's effects. *Purter*, 771 F.2d at 691-93 (discussing reopening as an exception to claim preclusion). The first, less important to *res judicata* case law, occurs just after the initial determination, when the claimant's first step in the review process is sometimes a request for "reconsideration" of that decision. 20 C.F.R. §§ 404.907, 416.1407.

    The more critical and complicated mechanism is reopening a prior ALJ decision. The regulations allow the Commissioner, through an ALJ or Appeals Council, to peel back the determination or decision and revise it. 20 C.F. R. §§ 404.987, 404.992, 416.1487, 416.1492. The claimant or the Commissioner can initiate the process. *Id.* The reopening of a determination or decision can occur "for any reason" within twelve months of the notice

of the initial determination, but "good cause" must exist if the reopening occurs within two years of the initial determination for SSI claims and four years for DIB claims. *Id.* §§ 404.988, 416.1488. A DIB claim can also be reopened at any time under a few scenarios not relevant to the instant case. *Id.* § 404.988(c). Good cause exists, among other reasons, if "[n]ew and material evidence is furnished" for either type of claim, SSI or DIB. *Id.* §§ 404.989, 416.1489. If a determination or decision is reopened, *res judicata* does not apply. *Kaszer v. Massanari*, 40 F. App'x 686, 690 (3d Cir. 2002).

The decision whether to reopen, unless it implicates a colorable constitutional issue, evades judicial review: courts can only review the Commissioner's final decisions made after a hearing. *See* 42 U.S.C. § 405(g); *Califano v. Sanders*, 430 U.S. 99, 108-09 (1977) (holding that Commissioner's decision not to reopen is unreviewable). However, courts may review a decision not to reopen a case "to determine whether *res judicata* has been properly applied to bar the pending claim or whether, even though *res judicata* might properly have been applied, the prior claim has nevertheless been reopened." *Tobak v. Apfel*, 195 F.3d 183, 187 (3d Cir. 1999); *see also Kaszer,* 40 F. App'x at 690 ("But 'we will examine the record to determine whether or not a reopening has occurred.'" (quoting *Coup v. Heckler*, 834 F.2d 313, 317 (3d Cir. 1987))). Implicit reopenings occur, with unfortunate frequency, where the ALJ crafts a decision that appears to "readjudicat[e] part of the period already adjudicated by the first decision" rather than "adjudicate only the subsequent period." *Gay v. Comm'r of Soc. Sec.*, 520 F. App'x 354, 358 (6th Cir. 2013). As the Sixth Circuit lamented,

26

> If an ALJ intends to reopen prior decisions, he or she should say so, say why, and cite the appropriate regulation that permits reopening. If an ALJ intends instead to adjudicate only the subsequent period in light of changed circumstances, he or she should make this approach clear and cite the appropriate cases and acquiescence rulings. Regardless of which path the ALJs take, they must clearly state their approach.

*Id.*; *see also Haddix v. Astrue*, No. 10-30, 2010 WL 4683766, at *1-4 (E.D. Ky. Nov. 12, 2010) (remanding where ALJ's decision was unclear).

Constructive reopenings are found where the ALJ reviewed the entire record including the portions from the already adjudicated period, and decided "the merits of the claim." *Tobak*, 195 F.3d at 186. Thus, the Sixth Circuit found a reopening where the ALJ considered the entire period "in light of the new evidence . . . ." *Wilson v. Califano*, 580 F.2d 208, 212 (6th Cir. 1978). An additional factor that could lead to finding an implicit reopening is the ALJ's failure to discuss the prior determination or the *res judicata* doctrine. *See Martin v. Comm'r of Soc. Sec.*, 82 F. App'x 453, 455 (6th Cir. 2003); *Crady v. Sec'y of Health & Human Servs.*, 835 F.2d 617, 620 (6th Cir. 1987). Nonetheless, an ALJ's review of old or new evidence does not necessarily signify a constructive reopening, for such a review would be required to decide against reopening as well as for it. *See Girard v. Chater*, 918 F. Supp. 42, 44-45 (D.R.I. 1996). The ALJ's discussion of new evidence likewise might relate to her independent determination of whether to grant benefits in the unadjudicated period, again indicating no reopening occurred. *See id.* at 44.

The ability to reopen—explicitly or implicitly—must meet certain regulatory requirements. 20 C.F.R. §§ 404.987-404.996, 416.1487-416.1494. Chief among these is the two year (SSI) and four year (DIB) time limits for good cause reopenings. *Id.* §§

27

404.988, 416.1488. Consequently, an ALJ is powerless to reopen a claim outside these periods. *See Glazer v. Comm'r of Soc. Sec.*, 92 F. App'x 312, 315 (6th Cir. 2004) ("Because more than four years had passed since the denial of the original application, the Commissioner could not have constructively reopened Glazer's case.").

### G. Analysis

McAllister puts forth four arguments favoring remand, each of which is discussed in turn: (1) That the ALJ failed to give "good reasons" for granting Dr. Nowland minimal weight under 20 C.F.R. § 404.1527(d)(2) and SSR 96-2p, 1996 WL 374188 (July 2, 1996). (2) That the ALJ failed to perform the proper credibility analysis under 20 C.F.R. § 404.1529 and SSR 96-7p, 1996 WL 374186 (July 2, 1996). (3) That as a result of these defects, the ALJ failed to properly incorporate McAllister's impairments in the RFC report. And (4) that a sentence six remand is also appropriate because the Appeals Council failed to properly consider new and material evidence submitted following the hearing on April 3, 2014. I also note, as a preliminary matter, that the ALJ properly considered McAllister's claims on the merits with respect the period following March 21, 2011.

### 1. The ALJ Provided "Good Reasons" for Withholding Controlling and Great Weight from Dr. Nowland's Statement

McAllister contends that the ALJ rejected Dr. Nowland's treating source opinion "without justification . . . by failing to accord the opinion controlling or even great weight." (Doc. 14 at 15). She first argues that the ALJ referenced but did not cite to the "other substantial evidence" inconsistent with Dr. Nowland's opinion. (*Id.* at 19). In addition, she describes the ALJ's reasoning as logically inconsistent for finding certain impairments

"severe" but ignoring alleged limitations "predicated upon the impairments she herself found to exist!" (*Id.* at 17). As support, McAllister draws attention to various areas in the record that demonstrate harmony between Dr. Nowland's opinion and Dr. Shaikh's opinion. (*Id.* at 19) ("ALJ Gruenberg ignored the limitations found by Dr. Shaikh which essentially mirrored the findings by Dr. Nowland and her RFC statement.").

Controlling weight attaches only when an opinion (1) comes from a "treating source," (2) qualifies as a "medical opinion" about "the nature and severity of an individual's impairment(s)," (3) is "well-supported by medically acceptable clinical and laboratory diagnostic techniques, and (4) is "not inconsistent with the other substantial evidence in the individual's case record." SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996) (internal quotation marks omitted). If an ALJ does not grant the treating source controlling weight, it is entitled to such deference as the ALJ determines appropriate after evaluating the six-factor balancing test outlined in 20 C.F.R. § 404.1527. *Id.* at *4. In any event, the ALJ must provide "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record" when rendering a "denial," and "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* at *5.

The ALJ's decision not to grant controlling weight to Dr. Nowland's opinion is supported by substantial evidence. Contrary to McAllister's assertions, the ALJ makes sufficient reference to potential problems with Dr. Nowland's statement. That Dr. Nowland did not base her assessments on diagnostic tests—(Tr. 456, 458, 460) (leaving "Diagnostic

Tests" section blank)—yet discovered symptoms inconsistent with Dr. Shaikh, McAllister's other treating physician, demonstrates serious inconsistency. (Tr. 44) ("[Dr. Shaikh's] [e]xamination summaries . . . demonstrated . . . no tenderness at the cervical or thoracic spine, normal sensation in all extremities to touch, pressure, and sensation, 5/5 strength in all muscles . . . ."). Nor did Dr. Nowland provide explanations for McAllister's alleged work-preclusive need for mid-day work breaks and excessive absences, (Tr. 45, 655), which the ALJ found striking alongside McAllister's reported "improvement in virtually all symptoms through a combination of physical therapy and medication" over three years of a consistent and regular treating schedule. (Tr. 45, 59, 69, 71); *cf. Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469 (6th Cir. 2003) ("There was no objective medical evidence supporting Dr. Kriauciunias's assessment that Ms. Jones was limited in her ability to maintain regular attendance and the ALJ discredited his opinion by carefully reasoning that . . . she was capable of maintaining a regular schedule.").

The ALJ recognized that symptoms of fibromyalgia remain less susceptible to objective diagnostic evidence. As she points out, the inconsistencies in the record between Dr. Nowland's opinion and the "vast majority of [McAllister's] physical examinations" showing "no evidence of gait, sensorimotor, or other neurological abnormalities" can (and did) impugn the reputed severity Dr. Nowland ascribed to McAllister's alleged impairments. (Tr. 44-45). In addition, where—as here—the ALJ found reason to be skeptical of a claimant's credibility, this skepticism justifiably reflects poorly on medical opinions grounded largely upon that claimant's subjective statements regarding her symptoms. *See Blair v. Comm'r of Soc. Sec.*, 430 F App'x 426, 430 (6th Cir. 2011)

30

("Because credibility is particularly relevant in the absence of sufficient objective medical evidence, the courts will generally defer to the Commissioner's assessment of credibility when it is supported by an adequate basis."); *Stiltner v. Comm'r of Soc. Sec.*, 244 F App'x 685, 689 (6th Cir. 2007) ("[A]s the ALJ noted, Dr. Bansal's assessment appeared to be based primarily on Stiltner's subjective symptoms. . . . [and] the credibility of Stiltner's subjective complaints . . . [were] fair at best.") (internal quotation marks omitted); *accord Black v. Comm'r of Soc. Sec. Admin.*, 433 F App'x 614, 616 (9th Cir. 2011) ("Dr. Green's opinion was not supported by objective medical findings, and Dr. Green appeared to have relied heavily on Ms. Black's subjective complaints about her low back pain, which the ALJ found were only partly credible.").

The same reasons for withholding controlling weight from Dr. Nowland's opinion remain "good reasons" for according her opinion minimal, as opposed to great, weight. The ALJ plainly decided that despite Dr. Nowland's years-long treating relationship with McAllister, questions as to her opinion's supportability and consistency advised against deference. *See* 20 C.F.R. § 404.1527(c)(3)-(4). Indeed, she conveys her calculation by dutifully summarizing the inconsistencies in Dr. Nowland's opinion and the incredibility of McAllister's alleged symptoms, (Tr. 44-45).

That the ALJ found enough evidence in the record to find an impairment addressed in Dr. Nowland's reports "severe"—yet also find that certain evidence cast doubt upon Dr. Nowland's reliability—is not "illogical on its face" as McAllister suggests. (Doc. 14 at 11). Rather, these findings occur at the intersection of the ALJ's duty on the one hand to gauge whether the record as a whole contains evidence enough to prove that an impairment exists

31

whatsoever, and on the other hand to estimate the validity of particular voices in the evidentiary chorus. *See, e.g.*, *Vance v. Comm'r of Soc. Sec.*, 260 F App'x 801, 807 (6th Cir. 2008) ("While the record established a diagnosis of fibromyalgia . . . , substantial evidence in the record supports a finding [against] . . . disability benefits."). The fact that substantial evidence could have supported an opposite outcome likewise does not serve to disturb the outcome at hand. *See, e.g.*, *Kalmbach v. Comm'r of Soc. Sec.*, 409 F App'x 852, 859 (6th Cir. 2011) ("If substantial evidence supports the ALJ's conclusion and the ALJ applied the correct legal standards, we are not at liberty to reverse the ALJ's decision even if substantial evidence exists in the record that would have supported an opposite conclusion."). Here, the ALJ provided good reasons for granting minimal weight to Dr. Nowland's opinion, and thus her opinion betrays no error on this count.

### 2.  The ALJ Adequately Performed the Credibility Analysis

McAllister's second argument alleges error with respect to the ALJ's two-step "subjective complaints" analysis under 20 C.F.R. § 404.1529 and SSR 96-7p, 1996 WL 374186 (July 2, 1996). Namely, McAllister argues a failure to provide a "cogent" assessment of her "forthright[]" answers to the ALJ's questions resulted in a "conclusory finding that [McAllister's] testimony was not entirely credible." (Doc. 14 at 23). Moreover, the fact that McAllister "did not exaggerate her limitations and in fact indicated that some . . . had improved," she argues, belies any lack of credibility. (*Id.*)

As SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996) states, where a claimant's symptoms "suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone," the adjudicator must "make every reasonable effort" to

"shed light" on her statements' credibility. Factors "the adjudicator must consider" to this end include: (a) The claimant's "daily activities." (b) The "location, duration, frequency, and intensity" of her symptoms. (c) Aggravating and precipitating factors. (d) The "type, dosage, effectiveness, and side effects of any medication" taken to "alleviate" symptoms. (e) Treatment "other than medication" the individual receives. (f) "Any measures other than treatment" the claimant uses to "relieve" symptoms. And (g) "[a]ny other factors concerning the individual's functional limitations and restrictions" due to symptoms. *Id.*

Although the ALJ did find McAllister only "partially credible," her reasoning undoubtedly comports with applicable statutory and regulatory standards. For instance, the ALJ points to a dearth in objective medical evidence of certain symptoms and impairments. She notes that the absence of "cervical disc disease, brain abnormalities, or bilateral shoulder disorder"—and the scant evidence of "scoliosis and degenerative changes of the lumbar spine and hips"—raised "serious concerns regarding the severity of [McAllister's] back, shoulder, and hip disorders." (Tr. 44). The ALJ also notes that three years' conservative treatment saw marked "improvement in virtually all symptoms," an objective fact which reasonably appears to undermine McAllister's statements regarding work-preclusive symptoms. (Tr. 45).

The ALJ also unearthed inconsistencies between McAllister's function report, testimony, and medical records. McAllister's daily activities, and particularly her ability "to prepare meals, wash clothes and dishes, drive short distances, and go shopping in stores," seem to contradict her purported inability to lift five pounds or sit continuously for five minutes, as does her "travel to and from Florida in April of 2013" which

"necessitate[d] an extended duration of sitting." (Tr. 45). In this respect, McAllister's statements also conflict with Dr. Nowland's, who indicated McAllister could occasionally lift up to twenty pounds, and could sit continuously for thirty minutes, in her RFC report. *Compare* (*Id.* at 654-55), *with* (*Id.* at 68, 281).

A claimant's testimony—when peppered with inconsistencies or implausibilities—lacks credibility. In this case, the ALJ cautiously dissected McAllister's allegations and uncovered blemishes, which she then thoroughly outlined. Moreover, the analysis diligently tracks the factors described by law. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186 (July 2, 1996). This renders her credibility analysis far from "conclusory." (Doc. 14 at 23).

### 3.   The ALJ's RFC Finding Satisfies All Applicable Standards

Gesturing toward alleged defects in the ALJ's weight and credibility analyses, McAllister contends that the ALJ's RFC report fails to properly incorporate her impairments. McAllister also suggests that the ALJ "ignored [her] severe impairments." (Doc. 14 at 21). Because the RFC analysis did not "accurately portray [McAllister's] physical and mental impairments," the VE's responses to the ALJ's hypotheticals, McAllister argues, are deficient. (Doc. 14 at 21). Thus, the RFC finding constitutes error. (*Id.*).

Simply because the ALJ declines to "enumerate" McAllister's ailments at each stage of the RFC finding does not mean that she ignored them. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002). The RFC finding discusses each of McAllister's severe impairments, and contextualizes them based on the scope and validity of underlying

evidence. *E.g.*, (Tr. 42) ("At her hearing, the claimant testified that she suffers from . . . . lower back pain, headaches, and neuropathy in her extremities, and is only able to sit continuously for 5 minutes due to pain."); (*Id.*) ("The claimant alleges that she is disabled due to symptoms associated with a number of medical conditions including degenerative disc disease, fibromyalgia, diabetes, depression, anxiety, and idiopathic hypersomnia . . . ."); (*Id.*) ("[A] lower extremity EMG/nerve conduction study, performed on January 5, 2011, showed no evidence of significant peripheral neuropathy . . . ."); (Tr. 43) ("[T]he claimant underwent a lumbar spine MRI, which showed disc bulging at L3-L4 and L4-L5, with slight neural foraminal stenosis, but no evidence of disc protrusion or nerve root impingement . . . ."); (Tr. 44) ("[Dr. Shaikh] indicated that the claimant's fibromyalgia symptoms are exacerbated by temperature extremes, and that, due to chronic neck and lower back pain, she has been advised to avoid repetitive bending and twisting motions.") (internal quotation marks omitted). After a thorough examination, the ALJ found that although McAllister's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," her statements as to the "severity and limiting effects" were unverifiable. These determinations rest upon substantial evidence in the record.

McAllister points specifically to an alleged omission of neuropathy and fibromyalgia. But significantly, the RFC finding provides that McAllister "must avoid concentrated exposure to chemical fumes, dust, mold, and extreme hot and cold temperatures" as well as "hazards and vibrations . . . at the worksite," (Tr. 40), and that she "requires the ability to alternate between sitting and standing at-will." (Tr. 41). The ALJ baldly designed these provisions to accommodate McAllister's fibromyalgia and

neuropathy, at least to the extent the record substantiated the severity of their symptoms. (Tr. 657).

In addition, the ALJ's RFC finding sufficiently accommodates other severe and non-severe impairments that could restrict McAllister's capacity to work. *E.g.*, (Tr. 38, 40) (accommodating hip problems with, "The claimant can . . . occasionally kneel and crawl"); (*Id.*) (accommodating shoulder problems with, "The claimant can occasionally reach overhead with the upper extremities"); (*Id.*) (accommodating back problems with, "[The claimant] cannot climb ladders"); (*Id.*) (accommodating mood disorders with, "The claimant is limited to . . . working in a small, familiar group"). While certain aspects of this finding may disappoint McAllister, substantial evidence bolsters the ALJ's suspicions "regarding the severity of her back, shoulder, and hip disorders." (Tr. 44). That the ALJ reached her conclusions partly through reliance on evidence other than McAllister's isolated statements, such as her "mental status examination, work history, and reported ability to manage her finances, shop in stores, read, and use a computer," further validates the RFC findings in this case. (Tr. 44-45).

### 4. A Sentence Six Remand Is Not Appropriate Under the Circumstances

McAllister also seeks a sentence six remand based on "additional evidence" submitted to the Appeals Council on October 16, 2014. (Doc. 14 at 24). This evidence includes "records of Dr. Moutsatson" which "pertain to dates of service subsequent to" the ALJ's decision and "establish that [McAllister] continued to be suffering from fatigue, night sweats, headaches, sweating upon exertion, numbness or tingling as well as mood

and anxiety issues." (*Id.*). Additionally, a "note dated September 5, 2014" describes "low back pain, headache present for 16 days as well as . . . nausea and phonophobia" and "temperature decrease in the distal extremities." (*Id.* at 24-25). In summary, the new evidence is "continuing evidence of the conditions which were found to exist." (*Id.* at 25).

Sentence-six remand is not appropriate unless the claimant shows: (1) "that the evidence at issue is both 'new' and 'material,'" and (2) "that there is 'good cause for the failure to incorporate such evidence into the record in a prior proceeding.'" *Hollon ex. rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)). McAllister has not met her burden for either requirement.

In the new documents at issue, Dr. Moutsatson reports McAllister's complaints regarding "[t]iredness, fatigue, night sweats, . . . numbness or tingling, change in the memory, personality, mood or anxiety. . . . [p]ain in the joints[,] [d]ecreased muscle strength, weakness, and backache." (Doc. 14, Ex. A at 7-8). She notes that McAllister describes her headache as presenting symptoms such as "nausea[] and phonophobia" in "the frontal area" with "pressure-like and band-like. . . . constant" pain and "gradual" onset. (*Id.* at 11). Dr. Moutsatson's review of McAllister's symptoms note decreased temperature in her distal extremities, described as a "stocking-glove" pattern. (*Id.* at 13) (internal quotation marks omitted). Examining the lumbosacral spine revealed "[m]ultiple tenderpoints" and "pain of L5 palpation." In her "Assessment & Plan" section, Dr. Moutsatson lists nothing with regard to McAllister's fatigue, diabetes, backache, chronic pain, tremor, neck pain, soft-tissue pain, hypertension, B-complex deficiency, Vitamin D

deficiency, or Iron deficiency, although she notes "[a]cute exacerbation" of McAllister's migraines and diagnoses Maxalt to alleviate pain. (*Id.* at 14-15).

To satisfy her burden under the materiality requirement, McAllister must demonstrate "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988); *accord Davis v. Comm'r of Soc. Sec.*, No. 1:15-CV-0652, 2016 WL 3769406, at *5 (W.D. Mich. July 15, 2016). Dr. Moutsatson's reports appear to draw heavily on McAllister's subjective complaints rather than objective medical evidence—and as the ALJ illustrated in her opinion, McAllister's credibility as to the "severity and limiting effects of [her] impairments" remains suspect. (Tr. 44-45). As such, Dr. Moutsatson's notes provide little to no *new* evidence, and no *material* evidence whatsoever. That McAllister describes these documents as "continuing evidence," (Doc. 14 at 25), aptly illustrates the inconsequentiality of Dr. Moutsatson's records relative to the records before the ALJ when she made her decision. *See, e.g., Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993) ("The only relevant items . . . show no marked departure from previous examinations."). In addition, several pages McAllister submitted—(Doc. 14, Ex. A at 2-5)—were available for review by the ALJ, and thus do not qualify as "new." In short, McAllister cannot demonstrate a reasonable probability that the ALJ would have reached a different disposition of her disability claim if presented with this evidence.

### 5. The ALJ Properly Rendered a Decision Regarding the Unadjudicated Period Following March 21, 2011

Under *Drummond*, the first ALJ's decision is *res judicata* as to the issue of whether McAllister was disabled as of March 21, 2011, the date of decision on McAllister's first application. 126 F.3d at 842-43; (Tr. 41).

When considering a renewed application for benefits, SSAR 98-4(6) and *Drummond* create a presumption that facts found in a prior ruling remain true in a subsequent unadjudicated period unless "there is new and material evidence" showing changed circumstances occurring after the prior decision. *See Click v. Comm'r of Soc. Sec.*, No. 07-13521, 2009 WL 136890, at *4 (E.D. Mich. Jan. 16, 2009). To overcome the presumption, a plaintiff must proffer new and material evidence that her health declined. *Kennedy v. Astrue*, 247 F. App'x 761, 768 (6th Cir. 2007). Although this may be done by comparing circumstances existing at the time of the prior decision to circumstances existing at the time of review of the new application, the ALJ does not need to review the record from the prior decision. *Id.*; *Collier v. Comm'r of Soc. Sec.*, 108 F. App'x 358, 362-63 (6th Cir. 2004). In this case, neither party argues that the ALJ failed to properly apply the standards surrounding this *res judicata* analysis.

The ALJ neither expressly nor constructively reopened McAllister's first application, because she acknowledged the prior ALJ's decision and *res judicata* as to his RFC finding "absent evidence of an improvement or change in condition since the prior hearing." (Tr. 41). Nothing in her decision readjudicated a period considered by the first ALJ. Rather, the ALJ considered the merits of McAllister's claim from March 22, 2011, citing "a change in the claimant's condition since the prior decision." (*Id.*). In doing so, the

ALJ was permitted to review the previous ALJ's decision and McAllister's medical records prior to March 22, 2011. *Kennedy*, 247 F. App'x at 768 (6th Cir. 2007).

In short, the ALJ did not err in entertaining McAllister's disability claims.

### H. Conclusion

For the reasons stated above, the Court **RECOMMENDS** that McAllister's Motion for Remand (Doc. 14) be **DENIED**, the Commissioner's Motion (Doc. 15) be **GRANTED**, and that this case be **AFFIRMED**.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  September 26, 2016
                             S/ PATRICIA T. MORRIS
                             Patricia T. Morris
                             United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: September 26, 2016
                             By s/Kristen Castaneda
                             Case Manager